IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

03 AUG 15  PM 2: 07

... DISTRICT COURT
N.D. OF ALABAMA

AMERICAN CANOE ASSOCIATION,        )
et al.,                            )
                                   )
        Plaintiffs,                )
                                   )
v.                                 )        CV-00-BE-1795-NE
                                   )
THOMAS E. WHITE, Secretary of the  )
Army, et al.,                      )
                                   )
        Defendants.                )

ENTERED *rec*

AUG 1 5 2003

## MEMORANDUM OPINION

### I.      Introduction

This case is before the court on Plaintiffs' Motion for Summary Judgment (Doc. # 29) and Defendants' Cross Motion for Summary Judgment (Doc. # 32).[1]  Plaintiffs, American Canoe Association, Inc., Alabama Rivers Alliance, Friends of the Mulberry Fork, and Wild Alabama, are environmental groups who object to the decision of the United States Army Corps of Engineers to issue a § 404 Clean Water Act[2] permit to the Cullman-Morgan Water District to construct a dam across the Duck River in Cullman County, Alabama.  Defendants are Thomas E. White, the Secretary of the Army, and the United States Army Corps of Engineers ("COE").

Plaintiffs brought this action pursuant to the National Environmental Policy Act, 42 U.S.C. § 4321, *et seq.* ("NEPA").  Plaintiffs argue that the COE's decision to issue the permit

_____

[1]  Plaintiffs' filed a brief titled "Plaintiffs' Motion for Summary Judgment" (Doc. # 29), but did not file a formal motion seeking summary judgment.  At the hearing, the court noted this procedural deficiency and agreed to orally accept the brief as a motion for summary judgment.

[2] 33 U.S.C. § 1344(b)(1).

1

was arbitrary and capricious. Plaintiffs ask this court to vacate the COE's decision to issue the

permit without conducting an Environmental Impact Statement ("EIS"), vacate the § 404 permit,

and order the COE to perform an EIS for the project. In their Complaint Plaintiffs seek

declaratory and injunctive relief. They ask the court, in essence, to declare that the COE issued a

permit for the Duck River Project in violation of NEPA and to vacate that permit. They also ask

the court to enjoin the COE from allowing the Duck River Project to proceed until the COE

prepares an EIS.

The issues raised in the cross motions for summary judgment have been fully briefed by

the parties. The court held a hearing on these motions on February 20, 2003. After the hearing,

the court allowed the parties to submit additional briefs on whether the COE took a hard look at

the future water quality of the proposed impoundment and whether the COE took a hard look at

the downstream effects of the proposed dam. On April 2, 2003, Defendants submitted a post-

argument memorandum addressing these issues (Doc. # 49). On April 24, 2003, plaintiffs

submitted a response to defendants' memorandum (Doc. # 52). Thus, these motions are now ripe

for decision.

The issue before the court is whether the COE's decision to issue a Finding of No

Significant Impact ("FONSI") and a permit to build the dam, as opposed to first requiring the

preparation of an EIS, was arbitrary and capricious. Upon due consideration, the court answers

this question affirmatively. The court finds that the COE did not take a hard look at the

cumulative effects of other proposed projects in the Black Warrior River Basin, the future water

quality of the proposed reservoir, and the effect the proposed dam will have on the Mulberry

Fork of the Black Warrior River. The court also finds that, even if the COE took a hard look at

2

these environmental issues, the COE failed to make a convincing case for issuing a FONSI.

Because the court concludes that the Administrative Record fails to address these environmental concerns, the court concludes that remand is necessary. Therefore, the court GRANTS in part Plaintiffs' Motion for Summary Judgment (Doc. # 29) insofar as plaintiffs' requested a remand to the COE and a declaration that the permit be vacated. However, the court denies all other relief requested by plaintiffs. Specifically, the court does not mandate that the COE conduct an EIS. On remand, the COE should take a hard look at the issues discussed below, reconsider its decision, and determine whether an EIS is required for the Duck River project. Defendants' Motion for Summary Judgment is DENIED.

## II.    Facts and Procedural History[3]

The Cullman-Morgan Water District (the "Water District") was incorporated in July 1993 and is made up of Cullman County and the southern portion of Morgan County. The Water District's major customer is the poultry industry. Cullman County alone produces more poultry than twenty-five individual states. The Water District's incorporation was an attempt to rectify a growing need for water to service the poultry industry and other industrial facilities in Cullman and Morgan counties. Currently, the Water District is served by Lake Catoma, a man-made reservoir.

---

[3]The facts set out below are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

3

In 1994 and 1995, the Nashville District[4] of the COE prepared two reports which considered a minimum of fifteen options to satisfy the Water District's growing water needs. After preparing these reports, the COE selected the Duck River site as the preferred alternative. The preferred alternative is the construction of a dam on the Duck River that will create a reservoir for additional water capacity. This reservoir will flood 640 acres of land and will eliminate 5.7 linear miles of the Duck River, 3.2 miles of tributaries to the Duck River, and 1.32 acres of forested wetlands. The Water District holds the permit to construct the Duck River Dam. The reservoir is proposed to be used as a public water supply to meet emergency and future needs for Cullman County and portions of five surrounding counties.

Section 404 of the Clean Water Act, 33 U.S.C. § 1344, requires the COE to issue a permit for "the discharge of dredged or fill material" into navigable waters. Thus, a § 404 permit is a prerequisite to the building of any dam. On March 22, 1996, The Water District applied to the Mobile District of the COE for a § 404 permit to build the Duck River Dam. The COE issued a Draft Environmental Assessment ("EA") for the project in May, 1999. The Draft EA recommended the Duck River project as the preferred alternative and evaluated the potential environmental impacts of this alternative. The COE forwarded the Draft EA to several state and federal agencies. The Alabama Department of Environmental Management ("ADEM"), the Alabama Department of Conservation and Natural Resources ("ADCNR"), the United States

---

[4]Because the COE originally assumed that the source of additional water would lie within the Nashville District's civil works boundary, the Nashville District of the COE conducted the initial studies. However, because the proposed Duck River impoundment is located within the civil works boundary of the Mobile District of the COE, the Mobile District was the proper District to process the Duck River permit application. The Mobile District is currently overseeing the project. Following the transfer of the project to the Mobile District, the Water District hired COE employees from the Nashville District as paid consultants. AR 2417.

4

Environmental Protection Agency ("EPA"), the U.S. Fish and Wildlife Service ("FWS"), and several environmental groups and individuals expressed concerns about the environmental impacts of the Duck River impoundment.  These concerns included the loss of a free flowing stream, loss of wetlands, loss of fish and wildlife habitat, and the degradation of water quality in the proposed reservoir and downstream of the reservoir.

In October 1999, the COE issued a Final EA for the project.  The Final EA included the following mitigation measures added in response to the concerns voiced by the state and federal agencies: (1) minimum downstream flows from the Duck River reservoir were increased to levels recommend by the ADCNR; (2) annual releases were added for a canoe race on the Mulberry Fork; (3) a Watershed Management Plan was included; (4) Cullman County donated $120,000 to the Cullman County Soil and Water Conservation District to hire a full time employee to manage ongoing efforts to improve water quality in the Duck River; (5) water quality and biological monitoring programs were established to obtain base line criteria for evaluating pre- and post-impoundment conditions; and (7) a management plan for a reservoir buffer for old growth forest was added.

Following the issuance of the Final EA, the EPA and the FWS expressed further concerns about the impacts of the dam on the downstream portion of the Duck River.  However, on January 4, 2000, the FWS notified the COE that despite its concerns over the project, it would not request a higher level review of the proposed permit.  Similarly, on January 24, 2000, the EPA decided not to elevate its review of the project.

On January 28, 2000, the COE issued a FONSI and a § 404(b)(1) evaluation of the project.  The FONSI concluded that the proposed project would not have significant adverse

5

effects on the quality of the human environment. Thus, on February 1, 2000, the COE issued a §

404 permit to the Water District. The permit authorized the Water District to discharge 12,500

cubic yards of rock and earth fill into the Duck River to construct a dam and a 640 acre reservoir.

On April 10, 2000, plaintiffs filed this action. Plaintiffs generally argue that the COE's

decision to issue the FONSI and the permit, as opposed to requiring the preparation of an EIS,

was arbitrary and capricious. On March 2, 2001, plaintiffs moved for summary judgment and

asked the court to vacate the COE's FONSI and issue an order requiring the COE to prepare an

EIS. On March 30, 2001, defendants filed a cross-motion for summary judgment, asking this

court to find that the permit is valid and that the COE complied with NEPA. On August 13,

2002, this case was reassigned to the undersigned judge.

## III.   Legal Standards

### 1. Statutory Standards

"The 'object of NEPA is to require federal agencies to consider environmental values

when making decisions [and] the initial responsibility of the federal agency is to determine the

extent of the environmental impact.'" *Hill v. Boy*, 144 F.3d 1446, 1449 (11th Cir. 1998) (quoting

*C.A.R.E. Now, Inc. v. Federal Aviation Admin.*, 844 F.2d 1569, 1572 (11th Cir. 1988)). "The

National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321-4370d, is not a substantive

environmental statute which dictates a particular outcome if certain consequences exist. Instead,

NEPA creates 'a particular bureaucratic decisionmaking process.'" *Sierra Club v. United States

Corps of Eng'rs*, 295 F.3d 1209, 1214 (11th Cir. 2002) (quoting *Robertson v. Methow Valley

Citizens Council*, 490 U.S. 332, 349 (1989)).

Section 102(2) of NEPA, 42 U.S.C. § 4332(2)(C), contains a Congressional mandate that

6

afederal agencies consider the environmental impact, and potential alternatives, for every

proposed "major Federal action significantly affecting the quality of the human environment." It

is an "action-forcing" provision designed to prevent agencies from acting on incomplete

information and to "ensure[] that important effects will not be overlooked or underestimated only

to be discovered after resources have been committed or the die otherwise cast." *United States*

*Corps of Eng'rs*, 295 F.3d at 1214 (quoting *Robertson*, 490 U.S. at 349).

To determine whether an action may have significant environmental impacts, and

therefore require an EIS, an agency is required to comply with regulations promulgated by the

Federal Council on Environmental Quality ("CEQ").  40 C.F.R. § 1500.3; *Hill*, 144 F.3d at 1450.

The CEQ regulations direct federal agencies to first prepare an EA that "provide[s] sufficient

evidence and analysis for determining whether to prepare an environmental impact statement or a

finding of no significant impact." " 40 C.F.R.§ 1508.9(a)(1) (2002).  "Thus, an agency will reach

one of two conclusions in an EA: 'either that the project requires the preparation of an EIS to

detail its environmental impact, or that the project will have no significant impact . . .

necessitating no further study of the environmental consequences which would ordinarily be

explored further through an EIS." *Hill*, 144 F.3d at 1450 (quoting *Sabine River Auth. v. United

States Dep't of Interior*, 951 F.2d 669, 677 (5th Cir. 1992)).  If the agency makes the latter

conclusion, as in the instant case, the agency must issue a FONSI explaining why the action will

have no significant impact on the environment.  40 C.F.R. §§ 1501.4(e), 1508.13.

Plaintiffs challenge the COE's decision to issue a FONSI and to not prepare an EIS and

argue that its decision was arbitrary, capricious, and violative of the Administrative Procedure

Act ("APA").  *See* 5 U.S.C. § 7602(A)(C).  The Eleventh Circuit holds that courts must review

an agency's decision not to prepare an EIS under an "arbitary and capricious" standard of review.
*Hill*, 144 F.3d at 1450. In applying this standard, a district court gives deference to the agency

and refrains from substituting its own judgment for that of the agency. *United States Corps of*

*Eng'rs*, 295 F.3d at 1216 (citing *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut.*

*Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). However, the court has a duty to look beyond the scope

of the decision itself to the relevant factors that the agency considered. "This duty requires the

court to consider not only the final documents prepared by the agency, but also the entire

administrative record." *United States Corps of Eng'rs*, 295 F.3d at 1216 (citation omitted).

The Eleventh Circuit has adopted four criteria that a court should consider in determining

whether an agency's decision not to prepare an EIS is arbitrary and capricious:

> First, the agency must have accurately identified the relevant environmental
> concern. Second, once the agency has identified the problem it must have taken a
> "hard look" at the problem in preparing the EA. Third, if a finding of no
> significant impact is made, the agency must be able to make a convincing case for
> its finding. Last, if the agency does find an impact of true significance,
> preparation of an EIS can be avoided only if the agency finds that changes or
> safeguards in the project sufficiently reduce the impact to a minimum.

*Hill,* 144 F.3d at 1450 (citations omitted). In determining whether an agency has met the second

step of this process and taken a "hard look" at relevant environmental problems, the Eleventh

Circuit offers the following guidance:

> An agency has met its "hard look" requirement if it has "examined the relevant
> data and articulated a satisfactory explanation for its action including a 'rational
> connection between the facts found and the choice made.'" *Motor Vehicle Mfrs.*
> [*Ass'n v. State Farm Mut. Auto. Ins. Co.*], 463 U.S. at 43, 103 S. Ct. at 2866. The
> court will overturn an agency's decision as arbitrary and capricious under "hard
> look" review if it suffers from one of the following: (1) the decision does not rely
> on the factors that Congress intended the agency to consider; (2) the agency failed
> entirely to consider an important aspect of the problem; (3) the agency offers an
> explanation which runs counter to the evidence; or (4) the decision is so

> implausible that it cannot be the result of differing viewpoints or the result of
> agency expertise. *Id.*, 103 S. Ct. at 2867. If the court finds deficiencies in the
> agency's reasoning, it may not rectify them or provide a reasoned basis for the
> agency decision which the agency itself has not articulated. *Id.*, 103 S. Ct. at 2867.
> Instead, it must remand to the agency so that it may reconsider its own reasoning
> and decision.

*United States Corps of Eng'rs*, 295 F.3d at 1214.

When reviewing a final agency action under the APA, the scope of the court's review is

properly limited to the administrative record that was before the agency when it made its

decision. *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985); *Pollgreen v. Morris*,

770 F.2d 1536, 1545 (11th Cir. 1985). "The role of the court in reviewing the sufficiency of an

agency's consideration of environmental facts is limited both by the time in which the decision

was made and by the statute mandating review." *Fund for Animals v. Rice*, 85 F.3d 535, 546

(11th Cir. 1996). Thus, in analyzing the COE's action, the court only considers the

Administrative Record that was filed in this case. The court disregards any evidence that was

filed by the parties and any arguments that were made at the hearing that relied on evidence

outside the record and instead focuses on the Administrative Record.

Where the initial level of judicial review of agency action lies in a district court, the

district court does not act as a fact-finder. *Florida Power & Light Co.*, 470 U.S. at 744. Instead,

"[t]he task of the reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. §

706, to the agency decision based on the record the agency presents to the reviewing court."

*Florida Power & Light Co.*, 470 U.S. at 743-44. Thus, the only issue before this court is whether

the COE's decision not to issue a FONSI and not to prepare an EIS for the Duck River project

was an arbitrary and capricious action in violation of the APA.

9

### 2. Summary Judgment Standard

This case is before the court on cross-motions for summary judgment filed pursuant to Rule 56 of the Federal Rules of Civil Procedure. When a district court reviews a motion for summary judgment under Rule 56, it must determine two things: (1) whether any genuine issues of material fact exist; and, if not, (2) whether the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56 (c). To succeed, the moving party bears the burden of establishing both prongs of the summary judgment test. The nonmoving party may defeat the motion for summary judgment by establishing *either* genuine issues of material fact *or* that the movant is not entitled to judgment as a matter of law.

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56). The party seeking summary judgment can meet this burden by offering evidence showing no dispute of material fact or by showing that the nonmoving party's evidence fails to meet some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. Rule 56, however, does not require "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Celotex*, 477 U.S. at 323.

When the moving party has met his burden, Rule 56 (e) "requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine

10

issue for trial.'" *Celotex,* 477 U.S. at 324 (quoting Fed. R. Civ. P 56 (e)).  The responding party

does not need to present evidence in a form admissible at trial; "however, he may not merely rest

on his pleadings." *Celotex,* 477 U.S. at 324.  "The plain language of Rule 56 (c) mandates the

entry of summary judgment, after adequate time for discovery and upon motion, against a party

who fails to make a showing sufficient to establish the existence of an element essential to that

party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at

322.

In responding to a properly-supported motion for summary judgment, the non-moving

party "must do more than simply show that there is some metaphysical doubt as to the material

fact." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).  If the

evidence is "merely colorable, or is not significantly probative, summary judgment may be

granted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50 (1986) (citations omitted);

*accord Spence v. Zimmerman,* 873 F.2d 256 (11th Cir. 1989).

Substantive law determines which facts are material and which are irrelevant.  *Anderson,*

477 U.S. at 248.  A dispute is genuine "if the evidence is such that a reasonable jury could return

a verdict for the nonmoving party."  *Anderson,* 477 U.S. at 248.  Issues of fact are "'genuine'

only if a reasonable jury considering the evidence presented could find for the nonmoving party."

*Anderson,* 477 U.S. at 249.  Material facts affect the outcome of the trial under governing law.

*Anderson,* 477 U.S. at 248.  To determine whether a material fact exists, the court must consider

all the evidence in the light most favorable to the nonmoving party.  *Anderson,* 477 U.S. at 249;

*Patton v. Triad Guar. Ins. Corp.,* 277 F.3d 1294, 1296 (11th Cir. 2002); *Witter v. Delta Airlines,

Inc.,* 138 F.3d 1366, 1369 (11th Cir. 1998).

11

After both parties have addressed the motion for summary judgment, the court must grant the motion *if* no genuine issues of material fact exist *and if* the moving part is entitled to judgment as a matter of law. Fed. R. Civ. P. 56 (c). In reviewing the evidence submitted, the court must "view the evidence presented through the prism of the substantive evidentiary burden," to determine whether the nonmoving party presented sufficient evidence on which the jury could reasonably find for the nonmovant. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1998). The court should not weigh the evidence or make determinations as to the credibility of witnesses because these decisions are within the province of the jury. *See Anderson*, 477 U.S. at 255; *Stewart v. Booker T. Washington Ins. Co.*, 232 F.3d 844, 848 (11th Cir. 2000); *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999). Thus, "the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. "The nonmovant need not be given the benefit of every inference but only of every reasonable inference." *Graham*, 193 F.3d at 1282 (quoting *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988)).

**IV.    Discussion**

Plaintiffs make two primary challenges to the COE's issuance of the permit. First, they argue that the COE failed to take a "hard look" at the environmental impacts of the Duck River dam. Second, plaintiffs argue that, even assuming the COE took the requisite hard look at these environmental impacts, the COE failed to make a "convincing case" for its finding of no significant environmental impact for the proposed project.

At oral argument and in their post-hearing brief, defendants stated that the COE

12

concluded its review of the Duck River project with a FONSI, thereby implicating the third step of the *Hill v. Boy* framework.  Thus, defendants argued that this court should only consider whether the COE made a convincing case for issuing the FONSI.  However, defendants also argued in their post-hearing brief that should the court find that defendants failed to make a convincing case for issuing the FONSI, the court should then move to the fourth step and consider whether the COE included sufficient safeguards in the permit to reduce any significant environmental impacts to a minimum.  The court is not persuaded by this alternative reasoning.

Because defendants have consistently argued that they issued a FONSI based on a finding of no significant environmental impact–not that they included sufficient safeguards to ameliorate any significant impacts–the court finds that the proper question before the court is whether defendants met steps two and three of the *Hill v. Boy* framework.  Therefore, the court considers whether the COE took a hard look at the relevant environmental problems and whether the COE made a convincing case for its FONSI.

The court recognizes that its review of the COE's agency action must be narrow and must presume the agency action valid.  However, "a court can only uphold the decision of an administrative agency on those grounds 'upon which the record discloses that its action was based.'" *America's Cmty. Bankers v. FDIC*, 200 F.3d 822, 935 (D.C. Cir. 2000) (quoting *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943)).  "Courts are not commissioned to remake administrative determinations on different bases than those considered and relied upon by the administrative agencies charged with the making of those decisions." *America's Cmty. Bankers*, 200 F.3d at 935.

Plaintiffs argue that the COE failed to take a hard look at (1) the need for a dam to supply

13

water to the Water District; (2) the impacts of reduced flows downstream of the dam; (3) the

future condition of the Duck River reservoir; and (4) the cumulative impacts of the proposed dam

and other existing and planned water supply projects in the Black Warrior Basin. In assessing

whether defendants took a hard look at these environmental issues, the court examines whether

(1) the decision relies on the factors that Congress intended the agency to consider; (2) the

agency failed to consider an important aspect of the problem; (3) the agency offers an

explanation that runs counter to the evidence; or (4) the decision is so implausible that it cannot

be the result of differing viewpoints or the result of agency expertise. *United States Corps of

Eng'rs*, 295 F.3d at 1214.

As an initial matter, the court finds that the COE adequately addressed the need for an

additional water source for the Water District and that the COE took the requisite hard look at

this need. In the EA the COE predicted that residential, commercial, and industrial demand for

water in the Water District will dramatically increase in the next few decades.[5] A primary reason

for this projected increase is the continued growth of industrial poultry farming in this area.[6]

Although Cullman County accounts for less than 2% of Alabama's land area, its farm income

represents 14.2% of the state total.[7] The Phase II Study conducted by the COE in 1995 projected

that the existing source of water for the Water District, Lake Catoma, will reach its capacity by

2005-2007.[8] Based on these projections and studies, the court cannot say that the COE failed to

––––––––––––––––––––

[5]AR 1600-01.

[6]AR 1601.

[7]AR 1601.

[8]AR 1622.

14

take a hard look at the need for an additional water source for the Water District.  Indeed, the court acknowledges that the need for an additional source of water for the District presents a real need that must be addressed, but the need alone fails to support the COE's decision.

Plaintiffs' most fact-intensive arguments focus on two issues: (1) whether the COE took a hard look at the cumulative impacts of other proposed reservoirs in the Black Warrior Basin, the future condition of the Duck River reservoir, and the reduced flows downstream of the dam; and (2) whether the COE made a convincing case for its FONSI.

### A.    The Cumulative Effects of Other Proposed Projects

CEQ regulations provide a valuable analytical framework for evaluating how cumulative impacts are to be addressed in an EA. *See Town of Cave Creek v. FAA,* 325 F.3d 320, 328 (D.C. Cir. 2002) (finding that regulations require the agency to consider the cumulative environmental impacts of any proposed action) (citing 40 C.F.R. § 1508.8); *Kern v. United States Bureau of Land Mgmt.*, 284 F.3d 1062, 1076-77 (9th Cir. 2002) (noting that, although the CEQ regulations only require that the agency preparing the EA consider cumulative impacts in its EA, the Third, Eighth, and Ninth Circuit Courts of Appeal often require that the EA include a discussion of the cumulative impact analysis) (citing *Soc'y Hill Towers Owners' Ass'n v. Rendell*, 210 F.3d 168, 180 (3d Cir. 2000); *Newton County Wildlife Ass'n v. Rogers*, 141 F.3d 803, 809 (8th Cir. 1998)).

Although the Eleventh Circuit has not specifically held that the agency must include a discussion of cumulative impacts analysis in its EA, the regulation cited above clearly requires the agency to at least consider cumulative impacts.  Unless the COE discusses the cumulative impact, a reviewing court cannot determine whether the agency complied with the regulatory mandate that it consider cumulative impacts.  When an EA concludes with a FONSI, as in the

15

instant case, the agency is required to briefly explain why an action will not have a significant

impact on the human environment. 40 C.F.R. § 1508.13. "Although the impact of a particular

project may be inconsequential when considered in isolation, if the cumulative impact of a given

project and other planned projects is significant, an applicant can not simply prepare an EA for

its project, issue a FONSI, and ignore the overall impact of the project on a particular [area]."

*Soc'y Hill Towers Owners' Ass'n*, 210 F.3d at 180 (citing 40 C.F.R. § 1508.27(b)(7)).  The CEQ

regulations define a "cumulative impact" as an "impact on the environment which results from

the incremental impact of the action when added to other past, present, and reasonably

foreseeable future actions regardless of what agency (Federal or non-Federal) or person

undertakes such other actions." 40 C.F.R. 1508.7.  "Cumulative impacts can result from

individually minor but collectively significant actions taking place over a period of time." 40

C.F.R. 1508.7.

Plaintiffs argue that the COE failed to take a hard look at the cumulative impacts of the

proposed dam and other existing and planned water supply projects in the Black Warrior River

Basin.  Plaintiffs point out that the EPA raised this issue in 1996 and recommended "that the

Corps begin a state wide initiative to address water needs and develop a statewide plan to address

these needs in the least environmentally damaging manner."[9]  Plaintiffs also note that the COE

failed to develop this statewide plan and that the EPA's final comments about the EA stated that

it "does not address the issues and concerns raised in our letters," including "questions on the

cumulative impacts of the various reservoirs that currently exist in the Black Warrior River

---

[9]AR 510.

16

drainage basin."[10]

Defendants counter that "Section 5.2 of the Final EA discusses, at length, cumulative and indirect impacts of the project." Doc. # 33 at 23. Section 5.2 of the EA is titled "Cumulative and Indirect (Secondary) Impacts to North Central Alabama" and includes four sections.[11] However, only section 5.2.2, "Impoundment Development," discusses the cumulative impact of the proposed project with other proposed projects in North Central Alabama. The only paragraph within section 5.2.2 that addresses this issue states:

> In recent years, several projects in the North Central Alabama area have been proposed. They include the Tom Bevill Reservoir on North River above Lake Tuscaloosa in Fayette County, an impoundment project by the Birmingham Water Works Board on the Locust Fork of the Black Warrior in Blount County and a project in Lamar County on a stream located in the Tombigbee River Watershed. Currently only the Tom Bevill Reservoir project has a DOA permit. No permit application has been filed for the Locust Fork project and according to the Birmingham Water Works Board (Ponstein, 1999) they do not intend to actively pursue the project for at least 10 years. The proposed Lamar County project was dropped from consideration because of potential environmental impacts.[12]

Defendants also argue that section 5.3 of the EA evidences a hard look at the cumulative impacts of the project. The pertinent part of section 5.3 reads as follows:

> As discussed in Section 5.2.2, several other reservoir projects have been proposed in the North Central Alabama area. Only one of these projects has a current DOA

---

[10]*See*, AR 2235. The U.S. Fish and Wildlife Service voiced similar concerns in a May 7, 1996 letter to the COE: "The Service is not only concerned about the direct impacts of this single reservoir but the cumulative impacts of other similar projects. Several reservoirs are currently in the Black Warrior drainage basin and five new sites (Locust Fork, tributary to Locust Fork, Fayette County, Lamar County and Duck River) including this one are being proposed. The potential cumulative impacts of these dams have not been adequately addressed by the appropriate agencies." AR 476.

[11]AR 1651-54.

[12]AR 1652.

17

> permit while the others have been postponed or cancelled. Depending upon
> withdrawals from these proposed projects and if they are all constructed there
> could be impacts to the flows in area streams. However, based upon the releases
> and Watershed Management Plan proposed by the Applicant, impacts to the
> drainage basin from construction and operation of the Duck River Impoundment
> will be minimal.

AR 1654-55. Based on the above-cited language from the EA, defendants contend that they took

a hard look at these proposed projects and concluded that "[t]he cumulative impacts of [the Duck

River Reservoir] and other projects will not result in a major impairment of the water resources

nor interfere with the productivity and water quality of existing aquatic ecosystems."[13]

After engaging in an exhaustive review of the Administrative Record, the court has real

concerns about whether the COE took a hard look at the cumulative impacts of the project. The

most logical cumulative impact for the Duck River project would come from the proposed

impoundment on the Locust Fork, as this proposed impoundment is located within the Black

Warrior River Basin and is only thirty miles from the proposed impoundment on the Duck River.

Interestingly, the Administrative Record indicates that the COE initially intended to conduct an

environmental impact study on the Duck River project because of the cumulative problems that

would result from building reservoirs on both the Duck River and the Locust Fork.

In a February 24, 1994, Memorandum to the Chief of the Mobile Operations Division,

Davis L. Findley, the Acting Chief of the Regulatory Branch for the Mobile Division, stated:

> Several alternatives and reservoir sites were studied, but two sites will be
> recommended to the county. The original site on Flint Creek is in the Nashville
> District. The second site is on Duck Creek in the Mobile District. Nashville's
> Planning Division and the Appalachian Regional Commission (funding agency-$5
> million) have decided an EIS is required, and Nashville will be starting the EIS in
> the next few weeks. If the County selects the Mobile District site we need to

---

[13]AR 2441.

> coordinate the EIS with Nashville.  <u>The Mobile District site (Duck Creek) is about 30 miles from the proposed Birmingham reservoir site and within the Section 22 Black Warrior headwaters study area.  The study will have to address this project if Duck Creek is selected.</u>[14]  (emphasis added).

Despite this statement from the Acting Chief of the Regulatory Branch for the Mobile District, the COE ultimately issued a FONSI based on its assumption that the Locust Fork project had been postponed "for at least ten years."[15]  Thus, the COE's conclusory statement that "[t]he cumulative impacts of [the Duck River Reservoir] and other projects will not result in a major impairment of the water resources," was not based on any studies of the environmental impacts of building both the Locust Fork project and the Duck River project but on the COE's <u>assumption</u> that the Locust Fork project would not be built for at least a decade and, thus, did not deserve consideration in the EA.[16]

In *Hill v. Boy*, 144 F.3d 1446, 1451 (11th Cir. 1998), the Eleventh Circuit remanded an EA to the COE because the COE did not take a hard look at the potential environmental consequences of a petroleum pipeline remaining underneath a proposed reservoir.  The court remanded the EA because the record did "not support the Corps' <u>assumption</u> that the pipeline will be relocated and because . . . the Corps' failed to adequately consider the environmental impact of the pipeline remaining underneath the proposed reservoir." *Hill*, 144 F.3d at 1451 (emphasis added).  The assumption made in *Hill*--namely that the pipeline would be removed and therefore, was not an environmental problem--is similar to the COE's assumption in the case that

---

[14]AR 3.

[15]AR 1652.

[16]AR 2441.

19

the Locust Fork project will not take place for at least a decade, and thus, was not an

environmental problem that needed to be examined by the agency.  This conclusory assumption

is not supported by any evidence in the Administrative Record.  Instead, it is based solely on a

1999 representation by the Birmingham Water Works Board that it does not intend to pursue the

Locust Fork project for ten years.

    In *Hill*, the Eleventh Circuit explicitly declined to address the issue of whether newly

proffered evidence can be considered by a court when reviewing agency action.  144 F.3d at 1446

n.11.  The court did not address this issue because it found that remand was necessary because

the record before the COE did not support the assumption that the pipeline would be relocated.

*See Hill*, 144 F.3d at 1451 (noting that "a reviewing court may remand a case to the agency for

additional investigation or explanation 'if the record before the agency does not support the

agency action, if the agency has not considered all relevant factors, or if the reviewing court

simply cannot evaluate the challenged agency action on the basis of the record before it'")

(quoting *Florida Power & Light Co.*, 470 U.S. at 744.)  However, the appellate court did note

that the COE did not dispute the newly proffered evidence offered by the plaintiffs that the

pipeline was not going to be removed.  *Hill*, 144 F.3d at 1446 n11.

    This court also does not reach the question of whether newly proffered evidence can be

considered when reviewing agency action.  Like the court in *Hill*, this court finds that the COE's

assumption that the Locust Fork project will not take place for a decade is a conclusory

assumption not supported by the record.  The record contains no studies of the Locust Fork

project and no evidence that the cumulative impacts of the Locust Fork project and the Duck

River project would be insignificant.  Indeed, the record indicates that COE personnel were

20

aware that the cumulative impacts of these two projects should be addressed in an EIS.[17] The

COE's reasoning that, because the Locust Fork project will not be built for "at least a decade," it

was not an issue worthy of examination is contrary to the CEQ regulations governing the

agency's actions. *See* 40 C.F.R. § 1508.27(b)(7) (stating that for NEPA purposes "significance

exists if it is reasonable to anticipate a cumulatively significant impact on the environment").

Thus, the court finds that the COE failed to take a hard look at these cumulative impacts with the

information that was before the agency at the time it made its decision.

However, even if the court were to assume that the COE took a hard look at the

cumulative impacts, the court finds that the agency failed to make a "convincing case" for its

FONSI.  The agency's blanket statement that a ten-year delay for the Locust Fork project

eliminates any cumulative environmental problems for the Black Warrior River Basin is illogical

and conclusory.  The COE's assumption is clearly unwarranted based on its original assessment

that indicated that the cumulative impacts of the Locust Fork project must be studied and that an

EIS must be issued for the Duck River project.[18]  Furthermore, the record is completely devoid of

any evidence that the Birmingham Water Works Board has abandoned the Locust Fork project.

To the contrary, the record indicates that the Locust Fork project will ultimately be pursued.[19]

(stating that the Locust Fork project will not be "actively" pursued until 2009).

In determining whether a remand is necessary, the court must "address the question of

whether the issuance of the Corps' EA would be arbitrary and capricious based on the opposite

---

[17]AR 3.

[18]AR 3.

[19]AR 1652.

assumption" that the Locust Fork project will be built. *See Hill*, 144 F.3d at 1451.  The COE

failed to take a hard look at the Locust Fork project in preparing the EA and failed to assess the

potential adverse environmental impacts resulting from the construction of both the Duck River

project and the Locust Fork project.  The COE assumed that because the Locust Fork project had

not been permitted and had been postponed until 2009, it need not be studied to determine

whether the Duck River project will have significant adverse environmental impacts on the

quality of the human environment.  In making this assumption, the COE failed to identify the

environmental concerns that would arise if the Locust Fork project were in fact pursued.

Because the court concludes that the record does not support–and ultimately fails to

address–the COE's assumption that the Locust Fork project poses no cumulative impacts that

must be addressed by the agency, the court finds that a remand is necessary.[20]  On remand, the

COE should consider whether the Locust Fork project will ultimately be built and, if so, whether

the presence of the Locust Fork reservoir necessitates the preparation of an EIS for the Duck

River project.[21]

### B.    The Future Water Quality of the Proposed Reservoir

_____

[20]Although the court finds that remand is required because the COE failed to take a hard look at the cumulative impacts of the Locust Fork project and failed to make a convincing case for its FONSI as a result of this failure, the court also addresses the other arguments made by plaintiffs so that the agency may address all of these concerns on remand.

[21]The court also notes that the record contains no substantive discussion of whether the proposed Tom Bevill Reservoir will have any cumulative impacts on the area.  The Tom Bevill project is the only proposed project that had received a permit from the COE at the time of the EA.  Although the Tom Bevill project is not located as close to the Duck River as the Locust Fork Project, the court questions why the Tom Bevill project was not addressed in the EA.  To avoid a future challenge that the COE failed to take a hard look at the Tom Bevill project, the agency may want to consider this issue on remand and at least explain why it was not considered.

Plaintiffs also argue that the COE failed to take a hard look at the future condition of the proposed reservoir.  Specifically, plaintiffs argue that the COE failed to properly address the likelihood that the reservoir will become eutrophic as the result of the collection of nitrogen and phosphorus runoff from ever-increasing agricultural operations in the Water District.  Plaintiffs claim that because the COE failed to take a hard look at the increasing problem of agricultural runoff in the Water District, the Duck River Reservoir might ultimately become unfit for human consumption, the stated goal of the project, without significant additional treatment.

The future water quality of the proposed reservoir has been before the agency since the Duck River project was chosen as the preferred alternative.  In an April 24, 1996 Memorandum summarizing an On-Site Meeting for Commenting Agencies on the Duck River project, Jim Ezell, a consultant for the City of Cullman, stated that "Butch Thrasher . . . Superintendent of the Cullman Water Treatment Plant, joined the meeting.  Butch was questioned concerning possible water quality impacts due to agriculture in the area of Lake Catoma.  He stated that he believed there could possibly be a problem since they recently have had an algae bloom."[22] In an internal email dated September 19, 1998, COE employee John B. McFayden noted that the Fish & Wildlife Service and the EPA "will continue to question project water quality in the [proposed] lake and downstream.  The issue is - Will all the 'chicken shit' pollute the lake.  PD folks - is the EA adequate to address this issue?"[23]

As a result of the COE's recognition that the proposed impoundment might be impacted

---

[22]AR 471.

[23]AR 632.  Similar concerns about the water quality in the proposed lake caused by runoff from the poultry industry are noted at AR 634, 647.

23

from increased poultry production and the resulting nonpoint source pollution in the Water

District, the Water District hired a contractor to sample water in the Duck River project area.

This sampling took place in 1998 and was included in a Draft Report on Water Quality Modeling

that was sent to the COE in October 1998.  At that time, the contractor told the COE that "we

have a problem" with the water quality of the proposed lake.[24]

In response to the water quality problems that were revealed by the initial testing, the

contractor engaged a sub-contractor to undertake a technical review of the environmental

documentation that had been produced on the project.[25]  In an October 26, 1998, letter to the

contractor, the subcontractor stated the following:

> The issue of source protection to assure adequate water quality in the proposed
> reservoir was a major concern expressed during the meeting.  I believe this can be
> addressed through the development of a comprehensive watershed management
> plan and the establishment of a watershed management organization with the
> authority and ability to implement and enforce the plan.  The purpose of the
> reservoir is to provide a safe and reliable water source for the Cullman-Morgan
> Water District, and the project represents a sizeable investment.  The water quality
> data collected to date indicates a high potential for accelerated eutrophication if
> measures are not taken to control non-point source nutrient enrichment from
> existing agricultural practices.  An effective watershed management plan should
> be developed and presented in the NEPA document prior to circulation.[26]
> (emphasis added).

The COE immediately began preparing a watershed management plan as suggested by the

subcontractor and also engaged its Waterways Experiment Station to conduct a BATHTUB

---

[24]AR 673.

[25]AR 679.

[26]AR 679.

24

eutrophication model for the proposed reservoir.[27]  The BATHTUB model is a mathematical

model that is used as a tool for assessing the eutrophication potential of reservoirs and for

predicting the effectiveness of protection measures.[28]  Thus, the BATHTUB model was chosen to

help the COE determine if the proposed best management practices ("BMPs") in the newly

formulated watershed management plan would ultimately prevent the Duck River reservoir from

becoming too eutrophic.[29]

The Draft EA issued by the COE stated that the BATHTUB model produced the

following conclusions: "The proposed impoundment will receive high nutrient loads and will

likely exhibit water quality characteristics of a mildly eutrophic system. . . .  Application of

BMP's in the watershed will reduce nutrient loadings.  Present loadings need to be reduced

approximately 60 percent in order to achieve water quality characteristics associated with nearby

lakes of acceptable water quality."[30]  (emphasis added).  In an effort to begin reducing nutrient

loadings in the Duck River, the Cullman County Soil and Water Conservation District, in

cooperation with the Natural Resources Conservation Service, established a watershed

management plan.  This management plan was included in the Draft EA.

Agency comments to the Draft EA reflected a general dissatisfaction with the COE's

assumption that the watershed management plan would be able to reduce current nutrient

loadings by 60%–the reduction necessary to make the Duck River reservoir comparable to nearby

---

[27]AR 851.

[28]AR 852.

[29]AR 852.

[30]AR 911.

lakes of acceptable water quality.[31]   The Fish & Wildlife Service's comments are particularly

instructive:

> According to the EA, existing phosphorous and nitrogen loading in the Duck
> River creates the potential in the proposed reservoir for accelerated
> eutrophication.  A water quality model of the proposed reservoir was conducted
> using the BATHTUB model . . . .  The model was based on available data and the
> assumption that Best Management Practices (BMP's) would be effectively
> implemented to reduce existing nutrient loading in the watershed by 60 percent.
> The model's results predicted a reservoir that would be mildly eutrophic.  This
> "best case" scenario predicts a reservoir that would thermally stratify with an
> anoxic hypolimnion.  Mildly eutrophic lakes can concentrate and store nutrients
> and contaminants, thus releasing toxic slugs that can result in downstream fish
> die-offs and loss of wildlife resources.  Elevated fecal coliform levels, blue-green
> algal blooms in the reservoir, low pH and high concentrations of dissolved metals
> in the tailwater discharges including iron and manganese, would be expected in
> the "best case" scenario at the proposed project.  The potential exists for long-
> term water quality problems associated with releases from the proposed dam site.
> In addition, the reservoir's water would be adversely affected requiring extensive
> and expensive treatment before use as a potable water source.  The "worse [sic]
> case" scenario would be a severely eutrophic lake if the existing nutrient loading
> is not reduced by the anticipated 60 percent.  A highly eutrophic lake would be
> less desirable and more expensive for the CMWD to operate for its intended
> purpose as a water supply reservoir.  The long-term effects downstream of the
> dam could forever diminish utilization of the Duck River by fish and wildlife
> resources.[32]

The F&WS comments highlight concerns about the COE's assumption that the watershed

management plan will result in a 60% reduction in nutrient loadings.

   Plaintiffs argue that in making this assumption, the COE failed to take a hard look at the

---

[31]   *See*, AR 1432 (F&WS), 1465-66 (EPA).  When the Water District applied to the
Alabama Department of Environmental Management ("ADEM") to upgrade the classification of
the Duck River and its tributaries to a public water supply, ADEM responded that "We could not,
with today's information and water quality status of [the] Duck River and [its] tributaries,
recommend that a Public Water Supply Classification be approved by the Environmental
Management Commission."  AR 1529.  However, ADEM stated that it is "open to
reconsideration of our present position" when new water quality data is available.  *Id.*

[32]AR 1431-32.

future water quality of the proposed reservoir.  The COE argues that it addressed this issue by

including a watershed management plan as a necessary condition of the EA.[33]  Section 9.4 of the

Final EA describes the watershed management plan and states that the "purpose and goals of this

management plan are to reduce nutrient loadings in the proposed impoundment, provide a

reasonably treatable, high quality water supply, provide acceptable water quality for downstream

releases and promote an ecologically sound lake environment." [34]  To accomplish these goals, the

plan includes, *inter alia*, a water quality testing program for water in the proposed impoundment

and downstream of the impoundment.[35]

     After examining the record, the court finds that the COE was cognizant of the likelihood

that the proposed reservoir will suffer from eutrophication caused by the runoff created from the

increasing poultry industry in the area.  In an effort to address this problem and to satisfy its

statutory obligations under NEPA, the COE worked with the permit-holder to establish a

watershed management plan that it hopes will reduce nonpoint source pollution.  The problem

for this court is that the COE issued a FONSI based on the assumption that the watershed

management plan will reduce nutrient loadings in the proposed reservoir by 60%.  This "best-

case scenario" assumption is problematic because it is, at best, a post hoc goal rather than a

mitigation condition designed to reduce a significant impact.[36] The reservoir will be constructed

---

    [33]AR 1737 (stating that the watershed management plan is designed to prevent a "worst case scenario").

    [34]AR 1663.

    [35]AR 1663-64.

    [36]Defendants have consistently argued that they issued a FONSI based on a finding of no significant environmental impact–not that they included sufficient safeguards to ameliorate any

regardless of whether nutrient loadings are reduced by 60%, 25%, or even 10%.[37]

Although the court finds that the COE studied the future water quality problems in the proposed reservoir, the court concludes that agency ultimately failed to take a hard look at the results of the study. Like ADEM, the court recognizes that the proposed reservoir is a much needed water source for the Water District.[38] However, the current record does not support the COE's assumption that current nutrient loadings will be reduced by any percentage, particularly because the stated goal of the project is to provide potable water for a growing poultry industry–the very source of the pollution at issue.

Even if the court assumes that the agency's studies and the inclusion of the watershed management plan qualify as a hard look at the future condition of the reservoir, the court does not find that the COE made a convincing case for its FONSI. As previously stated, the agency issued a FONSI that explicitly found that the proposed project would have no significant impact on the environment. Therefore, the agency's FONSI was necessarily based upon the assumption that

_____

significant impacts.

   [37]Defendants argued in their post-hearing brief that the court placed too much emphasis on the assumed 60% reduction at the hearing because Figure 10 of the Waterways Experiment Station study states that a 25% or 10% reduction in nutrient loadings would result in an impoundment comparable to Lake Weiss or Lake Purdy (the water supply for Jefferson County). However, defendants also state that Appendix F of the EA, where the Waterways Experiment Station is found, is beyond the purview of this court in conducting its judicial review of the NEPA process. Any emphasis the court places on the 60% reduction assumed by the COE comes from this court's analysis of the administrative record. However, even if the court looked past the 60% reduction assumption that is cited in the Final EA, the COE's FONSI would still be based on the assumption that some reduction in loadings–whether 60% or 10%–would result from the management plan.

   [38]See AR 1529.

28

nutrient loadings <u>would be reduced</u> by 60%, as stated in the Final EA.[39]  The COE fails to make a convincing case that the adverse effects on the water quality caused by nonpoint source pollution justify a finding of no significant environmental impacts.

As in *Hill,* 144 F.3d at 1451, and as the court did previously in evaluating the cumulative impacts issue, the court must decide whether the issuance of the EA "would be arbitrary and capricious based on the opposite assumption" that nutrient loading would <u>not</u> be reduced by 60% by the management plan.  Assuming that the management plan does not significantly reduce current nutrient loadings, the court finds that issuance of the FONSI was arbitrary and capricious based upon its own test results reflecting a "high potential for accelerated eutrophication" if the watershed management plan were not successful.[40]

Because the record does not support the COE's assumption that nutrients will be reduced by 60%, the court finds that a remand is necessary.  In making this determination, the court considers whether the EA would be arbitrary and capricious based on the opposite assumption that nutrients will not be reduced by 60%.  Assuming this worst case scenario, the court concludes that the COE's FONSI and resulting decision not to prepare an EIS was arbitrary and capricious.  A remand is necessary so that the agency can consider whether nutrient loadings will not be reduced by 60% and, if so, whether the presence of this pollution necessitates the

---

[39]AR 1644.

[40]*See* AR 679; *See also*, AR 1431-32 outlining concerns from F & WS about the effects of a "mildly eutrophic" lake under the best case scenario assuming best management practices, and the greater concerns of a "severely eutrophic" lake under the worst case scenario.

preparation of an EIS.[41]

## C. The Downstream Effects of the Dam

Plaintiffs' final argument is that the COE failed to take a hard look at the downstream effects of the dam. Although plaintiffs make numerous arguments about the effect of altered temperature, sedimentation, and other environmental consequences on the downstream portion of the Duck River and the Mulberry Fork, the court finds that defendants did take a hard look at the effect of the dam on the 11 miles of the Duck River below the dam. Specifically, the permit contains mandatory downstream releases that were recommended by the Alabama Department of Conservation and Natural Resources.[42] The inclusion of these releases, as well as the fisheries, aquatic habitat, and low flow studies that were conducted on the Duck River, evidences a hard look at the effect of the dam on the Duck River.

However, the court is concerned about the COE's failure to study the effect of the dam on the Mulberry Fork of the Black Warrior River. The Duck River extends for 11 miles below the proposed dam to its confluence with the Mulberry Fork..[43] The proposed reservoir will impound 19% of the total watershed of the Mulberry Fork.[44] Although the mandatory downstream releases

---

[41]Notwithstanding defendants' argument at the hearing that this court can only consider evidence that is in the record, defendants filed a Declaration (Doc. 46) following the hearing that included over sixty pages of additional materials. These materials included "documentation of ongoing activities in the Duck River Watershed to address water quality issues." As previously stated, the court did not consider these documents in reaching its decision. *See Hill v. Boy*, 144 F.3d at 1446 n11. On remand, the agency can consider any additional testing that has been done since the watershed management plan was instituted.

[42]AR 2509.

[43] AR 2509.

[44]AR 1738.

that were included in the permit will benefit the Mulberry Fork, the COE failed to conduct any studies of the effect the overall reduced flow will have on the Mulberry Fork.  The record indicates that the COE limited its study of the environmental effects of the project to the Duck River because one agency employee concluded that the Mulberry Fork would not be affected by the impoundment.  In a February 24, 1997, email to a subordinate COE employee, John Mcfayden concluded that "I do not believe we need to studying [sic] watersheds beyond the Duck River downstream of the dam.  They should not be effected [sic]."[45]  Although this conclusion was not based on any scientific studies or data, the COE did not respond to other agencies' requests that the Mulberry Fork be studied, and the EA ultimately failed to address this issue.[46]

A reviewing court may remand a case to the agency for additional investigation or explanation "if the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it."  *Hill*, 144 F.3d at 1446 n.11 (internal citation omitted).  Because the COE failed to undertake any investigation of the effects the proposed dam will have on the Mulberry Fork, the court finds that the COE did not consider all relevant factors in evaluating the environmental consequences of the Duck River project.  Therefore, the court finds that remand is necessary to consider the effects the proposed dam will

---

[45]AR 540.

[46]The only study apparently done on the Mulberry Fork was the Aquatic Habitat Characterization and Benthic Species Survey, AR 1829-82, which studied four miles of the Mulberry Fork and the entire length of the Duck River below the proposed dam.  This study, standing alone, does not make a convincing case for the COE's decision to issue its FONSI.

have on the Mulberry Fork.  On remand, the COE should consider whether the construction of the Duck River reservoir will detrimentally affect the Mulberry Fork and, if so, whether the effects are sufficiently significant to require an EIS for the Duck River project.

## V.    Conclusion

The court is acutely aware that the proposed reservoir would provide a much needed water resource for the growing poultry industry in the Water District.  The court is also mindful that its review of the COE's issuance of the permit must be deferential and that this court is not to substitute its judgment for that of the agency.  *See United States Corps of Eng'rs,* 295 F.3d at 1216.  However, this court has a duty to look beyond the scope of the agency decision and to determine whether the agency accurately identified the relevant environmental problems.  *Id.* This court must be satisfied that the agency took a hard look at these relevant problems in preparing the EA and that the agency made a convincing case for its finding of no significant impact.  *See Hill,* 144 F.3d at 1450.

After engaging in a thorough review of the record, the court finds that the COE did not take a hard look at the cumulative effects of other proposed projects in the Black Warrior River Basin, the future water quality of the proposed reservoir, and the effect the proposed dam will have on the Mulberry Fork of the Black Warrior River.  The court also finds that, even if the COE took a hard look at these environmental issues, the COE failed to make a convincing case for issuing its FONSI.  The court, therefore, finds that the COE's decision to issue a FONSI was arbitrary and capricious based on its various assumptions.  Because the court concludes that the record does not support the agency's FONSI, the court finds that a remand is necessary.  On remand, the COE should take a hard look at the issues discussed above and determine whether an

32

EIS is required for the Duck River project.  Because the court concludes that the Administrative Record does not support the agency's action, and that the finding of no significant impact was arbitrary and capricious, the permit for the Duck River Project issued based on the FONSI must be vacated.

Plaintiffs seek an injunction precluding COE from allowing the Duck River Project to proceed until Plaintiff has conducted an environmental impact study. Because the court remands this matter to the COE to take another look at the issues addressed in this opinion and to then decide whether an EIS is needed, the court denies the plaintiffs' request to mandate an EIS. However, the COE is enjoined from allowing the project to proceed until it has taken a hard look at the issues raised and made a new determination concerning the potential environmental impacts addressed in this opinion.

By separate order, the plaintiff's Motion for Summary Judgment will be granted in part, and denied in part; the defendants' Motion for Summary Judgment will be denied.

DONE and ORDERED this _15th_ day of August, 2003.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE